**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 25, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

NEW MEXICO DEPARTMENT OF
GAME AND FISH,

     Petitioner - Appellee,

v.

UNITED STATES DEPARTMENT OF
THE INTERIOR; RYAN ZINKE,[*] in his
official capacity as Secretary of the United
States Department of the Interior; UNITED
STATES FISH AND WILDLIFE
SERVICE; JIM KURTH,[†] in his official
capacity as Acting Director of the United
States Fish and Wildlife Service;
DR. BENJAMIN TUGGLE, in his official
capacity as Southwest Regional Director
for the United States Fish and Wildlife
Service,

     Respondents,

and

DEFENDERS OF WILDLIFE; CENTER
FOR BIOLOGICAL DIVERSITY;
WILDEARTH GUARDIANS; NEW
MEXICO WILDERNESS ALLIANCE,

     Defendants
     Intervenors - Appellants,

Nos. 16-2189 & 16-2202

---

[*] Ryan Zinke is substituted for Sally Jewell as Secretary of the United States Department of the Interior pursuant to Fed. R. App. P. 43(c)(2).
    [†] Jim Kurth, Acting Director for the United States Fish and Wildlife Service, is substituted for Daniel M. Ashe pursuant to Fed. R. App. P. 43(c)(2).

and

_____

FOUNDATION TO PROTECT NEW
MEXICO WILDLIFE; NEW MEXICO
FARM AND LIVESTOCK BUREAU;
NEW MEXICO CATTLE GROWERS
ASSOCIATION, SPUR RANCH CATTLE
CO. LLC; MOUNTAIN STATES LEGAL
FOUNDATION; ASSOCIATION OF
FISH AND WILDLIFE AGENCIES;
STATE OF COLORADO; STATE OF
ALABAMA; STATE OF ALASKA;
STATE OF ARIZONA; STATE OF
ARKANSAS; STATE OF IDAHO;
STATE OF KANSAS; STATE OF
MICHIGAN; STATE OF MONTANA;
STATE OF NEBRASKA; STATE OF
NEVADA; STATE OF NEW
HAMPSHIRE; STATE OF OKLAHOMA;
STATE OF SOUTH DAKOTA; STATE
OF TEXAS; STATE OF UTAH; STATE
OF WISCONSIN; STATE OF
WYOMING; ROCKY MOUNTAIN ELK
FOUNDATION; SAFARI CLUB
INTERNATIONAL,

  Amici Curiae.

_____

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 1:16-CV-00462-WJ-KBM)**

_____

McCrystie Adams (James Jay Tutchton with her on the briefs), Defenders of Wildlife,
Denver, Colorado, for Defendants Intervenors-Appellants.

Rachel Heron, Attorney, United States Department of Justice, Environment and Natural
Resources Division, Washington, D.C. (John C. Cruden, Assistant Attorney General;
Andrew Mergen, Ellen Durkee, Meredith L. Flax, Bridget Kennedy McNeil, Clifford E.
Stevens, Jr., and Andrew A. Smith, Attorneys, United States Department of Justice,

2

Environment and Natural Resources Division, Washington, D.C.; and Ann Navarro and Justin Tade, Office of the Solicitor, United States Department of the Interior, with her on the briefs), for Respondents.

Matthias L. Sayer, New Mexico Department of Game and Fish, Santa Fe, New Mexico (Paul S. Weiland, Benjamin Z. Rubin, Ashley J. Remillard, Nossaman LLP, Irvine, California, with him on the briefs), for Petitioner-Appellee.

Kate Ferlic and Kristina Caffrey, Egolf + Ferlic + Harwood, LLC, Santa Fe, New Mexico, filed an amicus brief on behalf of Foundation to Protect New Mexico Wildlife.

Kent Holsinger, Holsinger Law, LLC, Denver, Colorado, filed an amicus brief on behalf of New Mexico Farm and Livestock Bureau.

M. Reed Hopper, Pacific Legal Foundation, Sacramento, California, filed an amicus brief on behalf of New Mexico Cattle Growers Association.

Carol Bambery, Association of Fish and Wildlife Agencies, Washington, D.C., filed an amicus brief on behalf of Association of Fish and Wildlife Agencies.

John I. Kittel, Mazur and Kittel, PLLC, Farmington Hills, Michigan, filed an amicus brief on behalf of Rocky Mountain Elk Foundation.

Anna M. Seidman and Douglas S. Burdin, Safari Club International, Washington, D.C., filed an amicus brief on behalf of Safari Club International.

Gina Cannan and Steven J. Lechner, Mountain States Legal Foundation, Lakewood, Colorado, filed an amicus brief on behalf of Spur Ranch Cattle Co. LLC and Mountain States Legal Foundation.

Lisa A. Reynolds, Assistant Attorney General, Office of the Colorado Attorney General, Denver, Colorado (Cynthia Coffman, Attorney General; Frederick R. Yarger, Solicitor General; with her on the briefs) (together with Luther Strange, Attorney General of Alabama, Montgomery, Alabama; Jahna Lindemuth, Attorney General of Alaska, Juneau, Alaska; Mark Brnovich, Attorney General of Arizona, Phoenix, Arizona; Leslie Rutledge, Attorney General of Arkansas, Little Rock, Arkansas; Lawrence G. Wasden, Attorney General of Idaho, Boise, Idaho; Derek Schmidt, Attorney General of Kansas, Topeka, Kansas; Bill Schuette, Attorney General of Michigan, Lansing, Michigan; Tim Fox, Attorney General of Montana, Helena, Montana; Douglas J. Peterson, Attorney General of Nebraska, Lincoln, Nebraska; Adam Paul Laxalt, Attorney General of Nevada, Carson City, Nevada; Joseph A. Foster, Attorney General of New Hampshire, Concord, New Hampshire; E. Scott Pruitt, Attorney General of Oklahoma, Oklahoma City, Oklahoma; Marty J. Jackley, Attorney General of South Dakota, Pierre, South

Dakota; Ken Paxton, Attorney General of Texas, Austin, Texas; Sean D. Reyes, Attorney General of Utah, Salt Lake City, Utah; Brad D. Schimel, Attorney General of Wisconsin, Madison, Wisconsin; Peter K. Michael, Attorney General of Wyoming, Cheyenne, Wyoming) filed an amicus brief on behalf of the States of Colorado, Alabama, Alaska, Arizona, Arkansas, Idaho, Kansas, Michigan, Montana, Nebraska, Nevada, New Hampshire, Oklahoma, South Dakota, Texas, Utah, Wisconsin and Wyoming.

_____

Before **HOLMES**, **MATHESON**, and **McHUGH**, Circuit Judges.

_____

**McHUGH**, Circuit Judge.

_____

These consolidated appeals arise from the district court's grant of a preliminary injunction to the New Mexico Department of Game and Fish (the "Department"). The injunction followed the release, without a state permit, of two Mexican gray wolf pups on federal land located in New Mexico by the United States Fish and Wildlife Service ("FWS"), an agency within the United States Department of the Interior ("Interior"). The district court's order enjoins Interior, FWS, and certain individuals in their official capacities from importing or releasing: (1) any Mexican gray wolves into the State without first obtaining the requisite state permits; and (2) any Mexican gray wolf offspring into the State in violation of prior state permits. Interior, FWS, Ryan Zinke, in his official capacity as Secretary of the Interior, Jim Kurth, in his official capacity as Acting Director of FWS, Dr. Benjamin Tuggle, in his official capacity as Southwest Regional Director for FWS (collectively "Federal Appellants"), and intervening defendants Defenders of Wildlife, Center for Biological Diversity, WildEarth Guardians, and New Mexico Wilderness Alliance

4

(collectively "Intervenor Appellants") separately filed timely appeals contending the district court abused its discretion in granting the Department a preliminary injunction.

Exercising jurisdiction under 28 U.S.C. § 1292, we reverse and vacate the district court's entry of a preliminary injunction.

## I.    BACKGROUND

### A.   *Factual History*[1]

### 1.  Mexican Gray Wolf Status and Recovery Efforts

The Mexican gray wolf (*Canis lupus baileyi*) is the smallest, rarest, and southernmost occurring subspecies of the North American gray wolf (*Canis lupus*). *See* Endangered and Threatened Wildlife and Plants; Revision to the Regulations for the Nonessential Experimental Population of the Mexican Wolf, 80 Fed. Reg. 2512–

---

[1] Although the parties and amici curiae present or refer, in varying degrees, to extra-record evidence to support their arguments, we focus only on the record before the district court. *See Regan-Touhy v. Walgreen Co.*, 526 F.3d 641, 648 (10th Cir. 2008) ("We generally limit our review on appeal to the record that was before the district court when it made its decision . . . ."); *see also Verlo v. Martinez*, 820 F.3d 1113, 1125–26 (10th Cir. 2016) (determining that "[w]e will not hold that the district court abused its discretion based on evidence not before it when it ruled," and further holding that "our review is limited to the evidence before the district court at the time of the preliminary injunction hearing, and we will not consider post-injunction events"). It is well-established that parties cannot build a new record on appeal. *See United States v. Kennedy*, 225 F.3d 1187, 1191 (10th Cir. 2000) ("Federal Rule of Appellate Procedure 10(e) authorizes modification of the record only to the extent it is necessary to 'truly disclose what occurred in the district court.'" (quoting Fed. R. App. P. 10(e)) (internal alterations omitted)); *id.* ("This court will not consider material outside the record before the district court."); *Anthony v. United States*, 667 F.2d 870, 875 (10th Cir. 1981) (finding Federal Rule of Appellate Procedure 10(e) "allows a party to supplement the record on appeal," but "does not grant a license to build a new record").

5

01, 2514 (Jan. 16, 2015) (to be codified at 50 C.F.R. pt. 17). "The gray wolf . . . has been at the forefront of the movement to conserve endangered species for many years" because "[b]y the 1930s, wolves were nearly erased from the lower 48 states as a result of one of the most effective eradication campaigns in modern history." *Humane Soc'y of the United States v. Jewell*, 76 F. Supp. 3d 69, 81 (D.D.C. 2014) (quoting Hope M. Babcock, *The Sad Story of the Northern Rocky Mountain Gray Wolf Reintroduction Program*, 24 Fordham Envtl. L. Rev. 25, 38 (2013)). These eradication efforts, initiated primarily to decrease the loss of livestock to wolf predation, included the trapping, shooting, and poisoning of wolves, and had a significant impact on the population of Mexican gray wolves in the United States. Largely as a result of these efforts, the Mexican gray wolf was thought to have been extirpated from its historic range by the 1970s.[2] *WildEarth Guardians v. Ashe*, No. CV-15-00019, 2016 WL 3919464, at *1 (D. Ariz. May 16, 2016) (citing 80 Fed. Reg. 2512–01).

In an effort to preserve and restore the Mexican gray wolf population, the subspecies was first listed as endangered in 1976, under the Endangered Species Act of 1973 (the "Act"). Determination That Two Species of Butterflies Are Threatened Species & Two Species of Mammals Are Endangered Species, 41 Fed. Reg. 17,736–01, 17,737–40 (Apr. 28, 1976) (to be codified at 50 C.F.R. pt. 17). The 1976 listing

---

[2] "In 1975, it was believed that fewer than 200 members of [the Mexican] gray wolf subspecies remained in Mexico and in the United States." *Humane Soc'y of the United States v. Jewell*, 76 F. Supp. 3d 69, 82 (D.D.C. 2014) (citing Lists of Endangered and Threatened Fauna, 40 Fed. Reg. 17,590–01, 17,590 (Apr. 21, 1975)).

was later subsumed by a final rule promulgated by FWS in 1978, which listed the entire gray wolf species in North America, south of Canada and excepting Minnesota, as endangered under the Act.[3] Reclassification of the Gray Wolf in the United States and Mexico, With Determination of Critical Habitat in Michigan and Minnesota, 43 Fed. Reg. 9607–01, 9607–615 (Mar. 9, 1978) (to be codified at 50 C.F.R pt. 17); *see also* 50 C.F.R. § 17.11(h) (2016). Between 1977 and 1980, the United States and Mexico worked in partnership to capture the last remaining wild Mexican gray wolves in order to initiate a captive breeding program referred to as the Mexican Wolf Species Survival Plan. 80 Fed. Reg. 2512–01 at 2515. As its name suggests, the two nations established the breeding program to prevent the extinction of the subspecies and to reestablish the Mexican wolf in the wild by breeding the wolves in captivity and eventually releasing them or their offspring into the wild. *Id.*

In 1982, FWS developed and adopted the first Mexican Wolf Recovery Plan to assist in the conservation and survival of the Mexican gray wolf, as required by 16 U.S.C. § 1533(f)(1).[4] This plan provides detailed information regarding the history and status of the Mexican gray wolf, and sets forth numerous recommendations and steps to be taken to enhance the prospect of the wolves' recovery. In detailing the

---

[3] The species was listed as threatened only in Minnesota. Reclassification of the Gray Wolf in the United States and Mexico, With Determination of Critical Habitat in Michigan and Minnesota, 43 Fed. Reg. 9607–01, 9612 (Mar. 9, 1978) (to be codified at 50 C.F.R pt. 17); *see also* 50 C.F.R. § 17.11(h) (2016).

[4] FWS has initiated various efforts to revise this recovery plan, but it has yet to issue a finalized revision. Until FWS completes a revised recovery plan, which is expected by November 2017, the 1982 Mexican Wolf Recovery Plan remains the only completed recovery plan for the subspecies.

objectives of the plan, FWS did not include criteria for defining when the subspecies'

recovery would be sufficient to merit delisting, as is generally required by 16 U.S.C.

§ 1533(f)(1)(B)(ii). Instead, FWS indicated it foresaw "no possibility for [a]

complete delisting of the Mexican wolf" due to the depressed state of its population.

Accordingly, FWS focused its efforts on the conservation and survival of the

subspecies, and the eventual reintroduction of the subspecies into the wild.

To that end, FWS determined its primary objectives to be "maintaining a

captive breeding program and re-establishing a viable, self-sustaining population of

at least 100 Mexican wolves in the middle to high elevations of a 5,000-square-mile

area within the Mexican wolf's historic range."[5] In keeping with these stated

objectives, FWS promulgated a final rule under Section 10(j) of the Act in 1998

("1998 10(j) Rule") establishing an experimental wild population of the Mexican

gray wolf. Endangered and Threatened Wildlife and Plants; Establishment of a

Nonessential Experimental Population of the Mexican Gray Wolf in Arizona and

New Mexico, 63 Fed. Reg. 1752–01, 1752 (Jan. 12 1998) (to be codified at 50 C.F.R.

pt. 17). FWS designated this population as "nonessential" to the continued existence

of the species.[6] *Id.* In addition to specifying population management guidelines, and

---

[5] The Mexican wolf's historic range generally includes present-day Arizona, New Mexico, southwestern Texas, and much of Mexico. *See* 40 Fed. Reg. 17,590–01 at 17,590.

[6] Before the Secretary of the Interior may authorize the establishment of an experimental population of an endangered or threatened species, Section 10(j) of the Act requires the Secretary to determine "on the basis of the best available information, whether or not such population is essential to the continued existence of

8

procedures for the "take" of individual wolves, the 1998 10(j) Rule allowed FWS to reintroduce Mexican wolves to the Blue Range Wolf Recovery Area—an area consisting of the entire Apache and Gila National Forests in east-central Arizona and west-central New Mexico.[7] *Id.* at 1752–54, 1764–65. The 1998 10(j) Rule also "authorized the release of 14 family groups of wolves [into the recovery area] over a period of five years." *WildEarth Guardians*, 2016 WL 3919464 at *1.

Since adoption of the rule, FWS has released a number of Mexican wolves into the Blue Range Wolf Recovery Area. But progress in meeting the wild population objective was slower than projected. *See* 80 Fed. Reg. 2512–01 at 2516, 2551. By year-end 2015, FWS estimated there were only ninety-seven Mexican wolves in the wild population. And the recovery program has run into barriers to increasing that number, including decreased genetic diversity and inbreeding—which Appellants

an endangered species." 16 U.S.C. § 1539(j)(2)(B). An "essential experimental population" is defined as a "population whose loss would be likely to appreciably reduce the likelihood of the survival of the species in the wild. All other experimental populations are to be classified as nonessential." 50 C.F.R. § 17.80(b). When an experimental population is deemed nonessential, it is treated as a species proposed to be listed under the Act and is not afforded designated critical habitat. 16 U.S.C. § 1539(j)(2)(C).

[7] The 1998 10(j) Rule also indicated FWS would reintroduce wolves into the White Sands Wolf Recovery Area, "the designated back-up area," if it determined "it to be both necessary for recovery and feasible." Endangered and Threatened Wildlife and Plants; Establishment of a Nonessential Experimental Population of the Mexican Gray Wolf in Arizona and New Mexico, 63 Fed. Reg. 1752, 1752–53, 1756–58, 1767 (Jan. 12 1998) (to be codified at 50 C.F.R. pt. 17). Both recovery areas are part of the larger Mexican Wolf Experimental Population Area ("MWEPA"). *See* Endangered and Threatened Wildlife and Plants; Revision to the Regulations for the Nonessential Experimental Population of the Mexican Wolf, 80 Fed. Reg. 2512–01, 2515 Figure 1 (Jan. 16, 2015) (to be codified at 50 C.F.R. pt. 17).

allege has decreased the reproduction rate of the wolves and may compromise the health of the wild population.

To address these and other issues, in June 2013, FWS proposed to delist the gray wolf, list the Mexican gray wolf subspecies as endangered, and revise the 1998 10(j) Rule. *Id.* at 2513. After it issued an Environmental Impact Statement for the proposed revisions, and the requisite notice and comment periods concluded, FWS promulgated its finalized revision to the 1998 10(j) Rule ("Revised 10(j) Rule") on January 16, 2015. *See id.* at 2512–13. The Revised 10(j) Rule, like the 1982 Mexican Wolf Recovery Plan and the 1998 10(j) Rule, does not purport to establish a plan to bring the Mexican gray wolf population to full recovery. Rather, it aims to increase the nonessential experimental wild population in order "to contribute to the future population goal . . . for the range-wide recovery of the Mexican wolf," once a comprehensive recovery goal is established and delisting is foreseeable.[8] *Id.* at 2517. However, among other changes, the Revised 10(j) Rule triples the population objective for the experimental population, from 100 to between 300 and 325 wolves. *Id.* at 2514–17, 2548–49. It also increases the Mexican Wolf Experimental Population Area ("MWEPA") and substantially expands the boundaries in New Mexico and Arizona where Mexican gray wolves are permitted to inhabit and be released. In addition, it eliminates the Blue Range Wolf Recovery Area and replaces

---

[8] As previously noted, the 1982 Mexican Wolf Recovery Plan does not include criteria for determining when the species population would be sufficient to merit delisting. FWS intends to include such criteria in its November 2017 revision to the recovery plan.

10

it with three distinct zones, each with separate guidelines governing the release, translocation, and occupancy of Mexican gray wolves within the zone. *Id.* at 2520, 2522–23. Finally, the Revised 10(j) Rule modifies procedures for New Mexico and Arizona to obtain authorization to remove Mexican wolves from the MWEPA where wolf predation is determined to have an unacceptable impact[9] on a wild ungulate herd.[10] *Id.* at 2516–25, 2561; *see also* 50 C.F.R. § 17.84(k).

### 2. New Mexico Release and Importation Permits

Federal Appellants allege the State and the Department worked collaboratively with FWS to conserve the Mexican gray wolf until 2011. At that time, the Department formally suspended its participation in the Mexican Wolf Recovery Program and withdrew as a partner agency and signatory of the Mexican Wolf Memorandum of Understanding, which it had signed in both 2003 and 2010. Thereafter, the Department requested FWS to apply for and receive a state permit, in accordance with state regulations, before releasing or importing any wolves within

---

[9] The Revised 10(j) Rule explains that an "[u]nacceptable impact to a wild ungulate herd will be determined by a State game and fish agency based upon ungulate management goals, or a 15 percent decline in an ungulate herd as documented by a State game and fish agency, using their preferred methodology." 50 C.F.R. § 17.84(k)(3).

[10] Ungulates are hoofed mammals, and in this case refer primarily to the State's elk and deer populations. *See Wyoming v. United States*, 279 F.3d 1214, 1218–19 n.2 (10th Cir. 2002) ("An ungulate is defined as a 'hoofed mammal.'" (quoting *Random House Dictionary* 2069 (2d ed. 1987))).

11

the State's borders.[11] New Mexico law prohibits the importation and release of non-domesticated animals, including Mexican gray wolves, without a permit from the Department. *See* N.M. Code R. § 19.35.7.8; *id.* § 19.35.7.19; *id.* § 19.31.10.11.

In accordance with 43 C.F.R. § 24.4(i)(5),[12] which directs federal agencies within Interior to comply with state permitting requirements when reintroducing wildlife except in certain instances, FWS filed two separate permit applications with the Department—one on April 1, 2015, and the other on May 6, 2015. In its permit applications, FWS sought authorization to release no more than twelve wolves within the State. FWS also sought a waiver from conditions set forth in an importation permit issued by the Department in January 2015, which allowed FWS to import two Mexican gray wolves into the State, but "prohibited [FWS] from releasing these wolves and any offspring and/or associated pups without prior written permission from the New Mexico Department of Game and Fish." On June 2, 2015, the Director of the Department denied both permit applications. As grounds for the denials, the Director indicated FWS had not demonstrated that the intended releases were

---

[11] FWS made numerous releases and importations between 2002 and 2014 without applying for or obtaining a state permit. FWS appears to have obtained the Department's approval for these releases and importations through "less formal" means than a state permit, including "exchanges of e-mails." Tr. of Prelim. Inj. Hr'g 11–12, *New Mexico Dep't of Game and Fish v. United States Dep't of Interior*, No. 16-cv-00462-WJ-KBM (D.N.M. 2016) (Dkt. No. 50).

[12] 43 C.F.R. § 24.4(i)(5) requires FWS to "[c]onsult with the States and comply with State permit requirements [when reintroducing wildlife], except in instances where the Secretary of the Interior determines that such compliance would prevent him from carrying out his statutory responsibilities."

12

provided for in a state or federal resource or species management plan or strategy, as required by Section 19.35.7.19(A)(3) of New Mexico's Administrative Code, and therefore the Director was unable to determine if such releases would conflict with state conservation management efforts. *See* N.M. Code R. § 19.35.7.19(A)(3) (indicating that in order to obtain a permit to release a non-domesticated animal, an applicant must "demonstrate that the intended release is provided for in state or federal resource or species management plans or strategies (CWCS)"); *id.* § 19.35.7.19(C) ("The director shall not approve any release permit that conflicts with current conservation management."). FWS appealed the decision to the New Mexico Game Commission ("Commission") on June 22, 2015, contending that: (1) the Director had failed to cite any state conservation management plan with which the requested release permits might conflict; (2) the intended releases were provided for in FWS regulations and management plans, including the Revised 10(j) Rule; and (3) FWS is not required to revise its recovery plan under the Act or State statutes or regulations. The Commission rejected FWS's arguments and upheld the Director's denial of the permits by issuing a Final Decision on September 29, 2015, in which it concluded, among other things, that the Revised 10(j) Rule was not a sufficient "management plan" under State regulations.

### 3. Release of Wolves Without a State Permit

In response to the Commission's Final Decision, FWS informed the Department on October 14, 2015, that it intended to move forward with its wolf recovery efforts and continue the reintroduction and release of Mexican wolves

within the State. In its letter informing the Department of its decision, FWS indicated that, consistent with 43 C.F.R. § 24.4(i)(5)(i), the Secretary of Interior had determined that compliance with the state permitting requirements would prevent the Secretary from carrying out his responsibilities under the Act.[13] FWS thus concluded it had independent legal authority under federal statutes and regulations to import, export, hold, and transfer wolves within the State, and to release wolves onto federal lands within the State without a state permit.

Sometime thereafter, FWS issued an Initial Release and Translocation Plan for 2016 under the Mexican Wolf Blue Range Reintroduction Project ("2016 Release Plan"). This plan identified several specific steps to release, translocate, and cross-foster Mexican wolves in Arizona and New Mexico.[14] FWS began implementing that plan by cross-fostering two Mexican wolf pups on federal land within the State in April or May 2016. It did so without first applying for or obtaining a state permit. As a result of these unpermitted releases and FWS's decision to continue the reintroduction of wolves on federal lands within the State through implementation of the 2016 Release Plan, the Department and Commission provided Federal Appellants a 60-day notice of their intent to initiate litigation on April 20, 2016.

---

[13] Recall that 43 C.F.R. § 24.4(i)(5)(i) provides, in pertinent part, that FWS must "comply with State permit requirements [in reintroducing wildlife], except in instances where the Secretary of the Interior determines that such compliance would prevent him from carrying out his statutory responsibilities."

[14] The term "translocate" is defined as "the release of Mexican wolves into the wild that have previously been in the wild." 50 C.F.R. § 17.84(k)(3). This same section defines "cross-foster" as "the removal of offspring from their biological parents and placement with surrogate parents." *Id.*

**B. *Procedural History***

On May 20, 2016, the Department filed a Complaint for Declaratory Judgment and Injunctive Relief against Federal Appellants, and simultaneously filed a Motion for Preliminary Injunction and Temporary Restraining Order requesting the district court to temporarily halt further releases of wolves by FWS within the State's borders. After conducting a hearing on the motion on May 26, 2016, the district court issued a memorandum opinion and order on June 10, 2016, in which it determined the Department was entitled to injunctive relief. Accordingly, the district court entered an order enjoining Federal Appellants from importing or releasing any Mexican wolves in the State without first obtaining permits from the Department. The order also enjoined Federal Appellants from importing or releasing Mexican wolf offspring in violation of previously issued state permits. But the district court denied the Department's request that Federal Appellants be required to capture and remove any Mexican wolves that had previously been imported and released in violation of state law.

On June 6, 2016, Intervenor Appellants filed a Motion to Intervene, which the district court subsequently granted on July 13, 2016. On July 28, 2016, Intervenor Appellants filed a Notice of Appeal and shortly thereafter Federal Appellants filed their Notice of Appeal.

On appeal, Appellants collectively challenge the district court's findings on all four preliminary injunction factors. Appellants first contend the district court erred by holding the Department had sufficiently established a significant risk of

15

irreparable injury. They argue this finding was an abuse of discretion because the Department failed to provide any factual or legal basis establishing that its wildlife management efforts would be irreparably harmed or that its sovereignty would be threatened by FWS's anticipated releases. Second, Appellants maintain the district court made legal errors when determining the Department would likely succeed on the merits of both its federal and state law claims, including (1) failing to accord deference to Interior's interpretation of its own regulation; (2) incorrectly interpreting federal statutes and regulations; and (3) failing to bar the Department's state law claims on the basis of sovereign immunity, intergovernmental immunity, or preemption. Finally, Appellants claim the district court erred on the two remaining preliminary injunction factors by discounting the harm a preliminary injunction would cause to the Mexican wolf population, and minimizing the public's interest in protecting that population.

We agree that the Department failed to establish that it will suffer irreparable harm absent an injunction, and we reverse on that basis. We therefore do not consider whether the Department satisfied the other preliminary injunction factors.

## II. LEGAL STANDARDS

### A. *Standard of Review*

We review the district court's decision to grant a preliminary injunction for abuse of discretion. *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016). "An abuse of discretion occurs where a decision is premised on an erroneous conclusion of law or where there is no rational basis in the

16

evidence for the ruling." *Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016) (internal quotation marks omitted). In making this determination, "we review the district court's factual findings for clear error and its conclusions of law de novo." *Id.*

## B. *Preliminary Injunction Standard*

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the [movant] is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *see also Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1261 (10th Cir. 2004) (noting that "because a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal" (internal quotation marks omitted)). We have often repeated the well-established standard that:

> [f]our factors must be shown by the movant to obtain a preliminary injunction: (1) the movant is substantially likely to succeed on the merits; (2) the movant will suffer irreparable injury if the injunction is denied; (3) the movant's threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest.[15]

---

[15] We have indicated that three types of preliminary injunctions are disfavored and require a movant to meet a heightened standard before a preliminary injunction may issue. "They are '(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits.'" *Fish v. Kobach*, 840 F.3d 710, 723–24 (10th Cir. 2016) (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012)). When "seeking such an injunction [the movant] must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of the harms." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 976 (10th Cir. 2004) (en banc). Here, the district court found it did not need to determine whether the injunction requested by the Department falls under any of these categories as the parties did not address it in their briefs, and because it found the Department had made a sufficiently strong showing to satisfy the heightened burden. We decline to

17

*Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016) (internal quotation marks omitted).

The Department and a pair of amici curiae suggest that a modified preliminary injunction standard applies in this case—that "[i]f the movant has satisfied the [last] three requirements for a preliminary injunction, the movant may establish likelihood of success by showing questions going to the merits so serious, substantial, difficult and doubtful, as to make the issues ripe for litigation and deserving of more deliberate investigation." *Walmer v. U.S. Dep't of Def.*, 52 F.3d 851, 854 (10th Cir. 1995); *see also N. Nat. Gas Co. v. L.D. Drilling, Inc.*, 697 F.3d 1259, 1266 (10th Cir. 2012) (finding that "generally, where the three latter harm factors weigh in favor of the movant, the probability of success factor is relaxed" (internal quotation marks omitted)). Although we have applied this modified approach in the past, our recent decisions admonish that it is not available after the Supreme Court's ruling in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). *See Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1287 (10th Cir. 2016) ("However, as the district court correctly noted, our modified test is inconsistent with the Supreme Court's recent decision in [*Winter*] . . . . Under *Winter*'s rationale, any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible"); *see also Planned Parenthood Ass'n of Utah*

reach this issue for two reasons: (1) the parties did not address it on appeal; and (2) under either standard, the Department was required to, but did not, show it will suffer irreparable injury if an injunction does not issue.

18

*v. Herbert*, 839 F.3d 1301, 1310 (10th Cir. 2016) (Gorsuch, J., dissenting from the denial of rehearing en banc) (recognizing that although "this court once suggested that the plaintiff's burden on the likelihood of success factor may be relaxed when the other preliminary injunction factors are satisfied . . . the Supreme Court has since cast doubt on that judgment"). Accordingly, we reject the use of a modified test to review whether the district court abused its discretion in issuing the preliminary injunction.

## C.  *New Mexico Regulations*

Three provisions of the New Mexico Administrative Code prohibit the importation and release of non-domesticated animals, including Mexican wolves, without a permit from the Department. In relevant part, N.M. Code R. § 19.35.7.8 provides "[i]t shall be unlawful to import any live non-domesticated animal into New Mexico without first obtaining appropriate permit(s) issued by the director."[16] Similarly, N.M. Code R. § 19.35.7.19 states "[n]o person shall release from captivity an imported animal into New Mexico except by obtaining a release permit from the

---

[16] As noted in the amicus curiae brief submitted by the Foundation to Protect New Mexico Wildlife, this regulation was revised effective December 2014 to include a provision requiring the Commission to review "any permit application for the importation of any carnivore that will be held, possessed or released on private property for the purpose of recovery, reintroduction, condition, establishment, or reestablishment in New Mexico." N.M. Code R. § 19.35.7.8; *see also* Vol. 25 N.M. Reg. 755 (December 15, 2014). In addition, the provision allows the Director to issue a permit only "in accordance with [C]ommission direction following their review of an application." N.M. Code R. § 19.35.7.8.

19

director."[17] Finally, N.M. Code R. § 19.31.10.11 makes it "unlawful for any person . . . to release, intentionally or otherwise, or cause to be released in this state any mammal . . . except domestic mammals . . . without first obtaining a permit from the department of game and fish." The Department contends these regulations allow the State to protect and preserve wildlife populations by monitoring and managing the importation and release of animals within the State.

### D.   *Federal Statutes and Regulations*

### 1.   The Endangered Species Act and Implementing Regulations

"Congress enacted the [Act] in 1973 to provide for the conservation, protection, restoration, and propagation of species of fish, wildlife, and plants facing extinction." *Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 704 (10th Cir. 2010) (internal quotation marks omitted). The Act's scope is broad and affords varying types of protections for species and subspecies based on their classification by the Secretary of the Interior ("Secretary") as endangered or threatened. *See, e.g.*, 16 U.S.C. § 1538(a). The Secretary is required "to promulgate regulations listing those species of animals that are 'threatened' or 'endangered' under specified criteria, and to designate their 'critical habitat.'" *Bennett v. Spear*, 520 U.S. 154, 157–58 (1997). If a species is given either of those classifications, the Act requires the Secretary to develop and implement "recovery plans" to aid those species' conservation and survival, unless he finds that such plans will not promote the

---

[17] This regulation similarly requires the Commission to review release permit applications and allows the Director to issue permits only in accordance with the Commission's direction. N.M. Code R. § 19.35.7.19.

20

conservation of the species. 16 U.S.C. § 1533(f)(1). The recovery plans must include, among other things, a description of necessary site-specific management actions and "objective, measurable criteria which, when met, would result in a determination . . . that the species be removed from the [endangered or threatened] list." *Id*. § 1533(f)(1)(B)(i)–(ii). These plans also require a notice and comment period before final approval may be given. *Id*. § 1533(f)(4).

In 1982, Congress amended the Act "to broaden the FWS's discretion to reintroduce endangered and threatened species into their historic ranges." *Forest Guardians*, 611 F.3d at 705. In particular, Congress added Section 10(j) to the Act,[18] which allows the Secretary to "authorize the release (and the related transportation) of any population . . . of an endangered species or a threatened species outside the current range of such species if the Secretary determines that such release will further the conservation of such species." 16 U.S.C. § 1539(j)(2)(A). These populations are

---

[18] We have previously explained:

> Congress added section 10(j) to the Endangered Species Act in 1982 to address the Fish and Wildlife Service's and other affected agencies' frustration over political opposition to reintroduction efforts perceived to conflict with human activity. Although the Secretary already had authority to conserve a species by introducing it in areas outside its current range, Congress hoped the provisions of section 10(j) would mitigate industry's fears experimental populations would halt development projects, and, with the clarification of the legal responsibilities incumbent with the experimental populations, actually encourage private parties to host such populations on their lands.

*Wyo. Farm Bureau Fed'n v. Babbit*, 199 F.3d 1224, 1231–32 (10th Cir. 2000) (citing 16 U.S.C. § 1539(j); H.R. Rep. No. 97-567, at 8 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2807, 2808, 2817).

referred to as experimental populations. *See id.* § 1539(j); 50 C.F.R. § 17.80. Under 16 U.S.C. § 1539(j), the Secretary has increased flexibility and managerial discretion to establish special rules for each experimental population that are designed to better conserve and recover the endangered or threatened species. *See Forest Guardians*, 611 F.3d at 705 ("Designation of a population as experimental also allows the Secretary flexibility and discretion in managing the reintroduction of endangered species." (internal quotation marks omitted)); *Wyo. Farm Bureau Fed'n v. Babbit*, 199 F.3d 1224, 1234 (10th Cir. 2000). But before the Secretary may authorize the release of an experimental population, he must "by regulation [often referred to as a 10(j) rule] identify the population and determine, on the basis of the best available information, whether or not such population is essential to the continued existence of an endangered species or a threatened species." 16 U.S.C. § 1539(j)(2)(B). If the Secretary determines that a population is *not* essential, for purposes of 16 U.S.C. § 1536 it is treated as a species proposed to be listed under the Act unless "in an area within the National Wildlife Refuge System or the National Park System." 16 U.S.C. § 1539(j)(2)(C)(i). In addition, nonessential populations are not afforded designated critical habitat. *Id*. § 1539(j)(2)(C)(ii). But otherwise, a nonessential population is entitled to the protections afforded threatened species under the Act. *Id.* § 1539(j)(2)(C).

Finally, recognizing the inherent potential for conflict between states and the federal agencies operating under the Act's authorizations, Congress included the directive that "[i]n carrying out the program[s] authorized by this [Act], the Secretary

22

shall cooperate to the maximum extent practicable with the States." 16 U.S.C.

§ 1535(a). Consistent with this provision, and in an attempt to promote comity, the

Secretary issued one of the regulations at issue in this case, which provides as

follows:

> (i) Federal agencies of the Department of the Interior shall:
>
> . . . .
>
>> (5) Consult with the States and comply with State permit requirements in connection with the activities listed below, *except in instances where the Secretary of the Interior determines that such compliance would prevent him from carrying out his statutory responsibilities*:
>>
>>> (i) In carrying out . . . programs involving reintroduction of fish and wildlife.

43 C.F.R. § 24.4(i)(5)(i) (emphasis added). The Act also provides specific guidance

for instances where state and federal laws conflict:

> Any State law or regulation which applies with respect to the importation or exportation of . . . endangered species or threatened species is void to the extent that it may effectively (1) permit what is prohibited by this chapter or by any regulation which implements this chapter, or (2) prohibit what is authorized pursuant to an exemption or permit provided for in this chapter or in any regulation which implements this chapter. This chapter shall not otherwise be construed to void any State law or regulation which is intended to conserve migratory, resident, or introduced fish or wildlife, or to permit or prohibit sale of such fish or wildlife.

16 U.S.C. § 1535(f).

23

## 2. Applicable Provisions of the Administrative Procedure Act

The Administrative Procedure Act ("APA") permits parties to challenge the actions of federal agencies, provided that the suit is not one for money damages. Section 702 of the APA provides that:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702. In addition to obtaining judicial review of agency action under § 702, parties may challenge agency action directly under § 706, which permits courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Wyo. Farm Bureau Fed'n*, 199 F.3d at 1231 (noting that under § 706 of the APA, we must essentially determine whether an agency: "(1) acted within the scope of their authority, (2) complied with prescribed procedures, and (3) took action that was neither arbitrary and capricious, nor an abuse of discretion").

## III.   DISCUSSION

### A.   *Irreparable Injury*

"[A] showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, [and therefore] the moving

24

party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004) (internal quotation marks omitted); *see also Port City Props. v. Union Pac. R. Co.*, 518 F.3d 1186, 1190 (10th Cir. 2008). We therefore begin our review by examining the district court's determination that the Department satisfied the irreparable injury requirement for injunctive relief. Because we ultimately find the Department failed to meet its burden of showing a significant risk of irreparable injury, we need not address the remaining preliminary injunction factors.

To obtain a preliminary injunction, a movant "must establish . . . that he is likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Although irreparable harm "does not readily lend itself to definition," "a plaintiff must demonstrate a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages." *Fish v. Kobach*, 840 F.3d 710, 751–52 (10th Cir. 2016) (internal quotations marks omitted). That harm "must be both certain and great," and not "merely serious or substantial." *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001); *see also RoDa Drilling Co., v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (holding "[p]urely speculative harm will not suffice" to satisfy the burden of showing irreparable injury). Moreover, the injury must be "likely to occur before the district court rules on the merits." *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1260 (10th Cir. 2003); *see also Heideman v. S. Salt*

25

*Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (holding that the movant "must show that the injury complained of is of such *imminence* that there is a clear and present need for equitable relief"). "While not an easy burden to fulfill . . . a plaintiff who can show a significant risk of irreparable harm has demonstrated that the harm is not speculative." *Greater Yellowstone Coal.*, 321 F.3d at 1258.

Before the district court, the Department argued it would be irreparably harmed in two distinct ways absent the grant of a preliminary injunction. First, it alleged the unpermitted release of wolves would "threaten to disrupt the State's comprehensive management effort[s] by introducing an apex predator in numbers, at locations, and at times not known" to the State, thereby threatening the State's wild ungulate herds. Second, it alleged the unpermitted releases would significantly interfere with the State's self-governance and invade State sovereignty. In response, Federal Appellants contended that the Department could not show the anticipated releases and translocations were likely to result in actual injury to the Department or to the State's management of wild ungulate herds. They further argued that legal precedents reject the notion that federal actions regarding federally protected wildlife on federal land interferes with a state's sovereign interests.

In weighing these arguments, the district court first determined that the release of wolves in violation of the State's permitting process, and any potential disruption to the Department's wildlife management efforts, could not be compensated after the fact by monetary damages. The district court then found that the Department had satisfied its burden with respect to irreparable injury by showing that the release of

Mexican wolves within the State, without providing the Department knowledge of the time, location, or number of releases, presented a sufficiently serious risk of harm to the State's comprehensive wildlife management efforts. The district court did not address the Department's assertions regarding harm to the State's sovereignty. We address each ground of irreparable injury advanced by the Department and conclude it has failed to establish a significant risk of irreparable injury in the absence of an injunction.

1. **The Department failed to establish FWS's anticipated releases pose a significant risk of irreparable injury to its wildlife management efforts.**

According to Federal Appellants, the Department presented no evidence to the district court connecting FWS's planned releases and importations to any significant adverse effect on the Department's wildlife management efforts. Given the absence of such evidence, Federal Appellants claim the district court abused its discretion when finding the Department had made a sufficient showing of irreparable harm. We agree.

The party seeking a preliminary injunction faces a high bar—"[t]o constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *Heideman*, 348 F.3d at 1189 (internal quotation marks omitted). A review of the relevant evidence presented before the district court shows conclusively that the Department failed to meet that burden. The only evidence the Department presented below to support its claim of harm to the State's wildlife management efforts was the

27

Declaration of Alexandra J. Sandoval, Director of the Department.[19] In her declaration, Director Sandoval explained that the Commission establishes population management objectives for various species within the State, and that the Department actively manages a number of these species, including ungulate herds. The Director also noted that because Mexican wolves prey primarily on ungulate species, the "predator and prey species must be managed together rather than in isolation from one another." Additionally, Director Sandoval stated the population objectives established by the Commission are generally created through use of an equation that takes into account several variables, including threats to the existing ungulate populations, and that the Department's lack of credible information regarding FWS's short- and long-term wolf recovery plans undermines the Department's ability to develop accurate species management objectives. Finally, Director Sandoval stated that the Department's management of the State's wildlife could only be successful when based on accurate data.

But to satisfy the irreparable harm factor, the Department "must establish both that harm will occur, and that, when it does, such harm will be irreparable." *Vega v. Wiley*, 259 F. App'x 104, 106 (10th Cir. 2007) (unpublished). Director Sandoval's declaration suffers from notable omissions in this regard. For example, Director Sandoval did not identify or address the type, likelihood, imminence, or degree of

___

[19] The Department did submit evidence detailing the number of Mexican wolf depredations on livestock or pets from 1998 to 2014. But because the Department's claims of irreparable injury relate to its ability to manage wild populations of ungulate species, this information is irrelevant to the present inquiry.

harm that the anticipated releases or importations would have on the State's ungulate species or the Department's ability to manage the species' populations. Rather, Director Sandoval simply asserted that "[i]ncreasing the population of wolves *has the potential* to affect predator-prey dynamics, and *may* affect other attributes of the ecosystem." The Department does not attempt to explain how Director Sandoval's statements are sufficient to establish that the anticipated releases are likely to affect that balance, or that any effect they may have on the balance would be irreparably harmful to its management efforts. And although the Director's declaration includes a conclusory statement that the Department lacks sufficient credible information to make accurate management objectives, it does not identify the type or level of harm this alleged deficiency causes to the Department's ability to manage the State's ungulate species. Ultimately, the Director's statements do not demonstrate that changes to predator-prey dynamics, other attributes of the ecosystem, or factors influencing the accuracy of the Department's management objectives would be at all harmful to the Department's management efforts, let alone indicate that any potential harm would be certain, imminent, and serious.

The district court and Department both assert that harm to the Department's wildlife management efforts is likely as a result of the Department's lack of "knowledge of the time, location, or number of releases" contemplated by FWS. But we find this assertion unavailing for two reasons. First, the Department's claim of insufficient information regarding the anticipated releases appears unsupported and at least partially contradicted by the record. The Revised 10(j) Rule details FWS's

29

intention to release one or two packs of wolves, consisting of two adult wolves and several pups, every four years for the next eight years, and one or two packs during the following three successive generations until year twenty of the program.[20] 80 Fed. Reg. 2512–01 at 2524. It also identifies seven potential release sites in Zone 1 of the Mexican Wolf Experimental Population Area. *Id.* Additionally, after informing the Department that it intended to proceed with its recovery efforts without state permits, FWS issued its 2016 Release Plan, in which it outlined plans for releases in 2016— including efforts to cross-foster pups and release a pack of wolves in New Mexico in June or July 2016.[21]

Second, the Department provided no evidence that the lack of any additional information regarding the time, location, or number of releases, beyond the documents or materials previously provided to it by FWS, was likely to subject it to irreparable harm. As previously noted, Director Sandoval's declaration included conclusory statements indicating that the Department's lack of credible information regarding FWS's anticipated releases undermines its ability to create accurate management objectives. Director Sandoval also asserted that the Department's

---

[20] The Revised 10(j) Rule also indicates FWS "may conduct several additional releases in the immediate future in excess of 2 effective migrants per generation to specifically address the high degree of relatedness of wolves in the current" Blue Range Wolf Recovery Area. 80 Fed. Reg. 2512–01 at 2524.

[21] Nearly one month after oral argument, the Department submitted supplemental authorities pursuant to Federal Rule of Appellate Procedure 28(j), including FWS's Initial Release and Translocation Plan for 2017 for the Mexican Wolf Blue Range Reintroduction Project ("2017 Release Plan"). This evidence was not presented to the district court, and we do not consider it here. *See Verlo*, 820 F.3d at 1126.

30

management of state wildlife species could only be successful when based on accurate data. But these sweeping assertions were unsupported by any explanation or evidence for how—or to what extent—this lack of information would adversely affect the State's comprehensive wildlife management efforts. And Director Sandoval could only speculate on whether the planned releases would have any effect on predator-prey dynamics or other attributes of the ecosystem, irrespective of when and where they occur.

Finally, the Department notes that its management of the State's ungulate species involves, among other things, establishing objectives for and controlling the populations of the State's ungulate herds. In addition to claiming FWS's anticipated releases affect the Department's ability to establish accurate population objectives, Director Sandoval indicated the releases also have the potential to affect predatory-prey dynamics within the State. On appeal, the Department goes one step further by asserting the releases threaten to disrupt the predator-prey balance it has established through its permitting and licensing programs because, in part, the releases could reduce ungulate populations by hundreds or thousands. But Director Sandoval's declaration offers no support for these contentions. And even when making the reasonable assumption that an increase in wolves would lead to increased predation, nothing in the record before the district court indicates that the FWS releases would disrupt the predator-prey balance or harm the Department's ability to manage the ungulate herd populations. For example, assuming *arguendo* that the Department is correct in asserting, for the first time on appeal, that a Mexican wolf may kill over

31

twenty elk and deer per year, the Department offered no evidence that the release of one, ten, fifty, or even one hundred additional wolves would affect the overall populations of the State's ungulate herds or necessitate action from the Department in order to manage and maintain those populations.[22]

The significance of the Department's failure to provide such evidence is highlighted by the information contained in the Revised 10(j) Rule, which indicates that between the years 1998 and 2013, FWS's initial release success rate was only twenty-one percent. This means that for every one hundred wolves released, only twenty-one survived, bred, and produced pups. 80 Fed. Reg. 2512–01 at 2524. Additionally, Federal Appellants presented the declaration of Sheryl L. Barrett, the Mexican Wolf Recovery Coordinator for Region 2 of FWS. In her declaration, Ms. Barrett indicated that as of 2014, FWS had detected "no impacts to wild ungulates in the Blue Range Recovery Area" and predicted the anticipated releases would have a "less than significant direct and indirect adverse impact[] on wild ungulate prey species." Ms. Barrett specified that she reached this conclusion primarily because of the low wolf-to-elk ratio estimates (2.56 wolves per 1,000 elk in 2014 and an

---

[22] Moreover, the Department cannot establish irreparable injury by asserting the loss of individual elk or deer. *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) ("To equate the death of a small percentage of a reasonably abundant game species with irreparable injury without any attempt to show that the well-being of that species may be jeopardized is to ignore the plain meaning of the word."); *see also Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1256–57 (10th Cir. 2003) (quoting *Frizzell*, but distinguishing the case before it because "the animals likely to be harmed . . . belong[ed] to a threatened species, not a 'reasonably abundant game species'").

32

estimated 3.9 wolves per 1,000 elk were the wolf population to reach 300 to 325

wolves), as well as provisions in the Revised 10(j) Rule allowing New Mexico to

request authorization to remove wolves from areas where unacceptable impacts to

wild ungulate herds are occurring. In light of this evidence, the Department's silence

with respect to any specific effects or adverse impacts to ungulate herds within the

State undercuts its claim of irreparable harm

Ultimately, Director Sandoval's declaration is insufficient to support the

district court's finding of irreparable harm. At most, the Director alleges the mere

possibility of an unidentified class and degree of harm. Such speculative assertions

are insufficient to carry the Department's burden, as "[i]ssuing a preliminary

injunction based only on a possibility of irreparable harm is inconsistent with our

characterization of injunctive relief as an extraordinary remedy that may only be

awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555

U.S. at 22. Standing alone, Director Sandoval's declaration does not provide any

evidence that FWS's anticipated releases and importations will impact the State's

ungulate herds, as opposed to individual members of those herds, or harm the

Department's management efforts with respect to those populations. Nor does it give

us any reason to depart from the "general rule, [that] a preliminary injunction should

not issue on the basis of affidavits alone." *Lane v. Buckley*, 643 F. App'x 686, 689

(10th Cir. 2016) (unpublished) (internal quotation marks omitted). Yet this

declaration is all the district court had before it when it found the State had

established it would suffer irreparable harm.[23] For these reasons, we conclude the record before the district court did not provide a rational basis for finding the State's comprehensive wildlife management efforts would suffer certain, great, and actual harm if Federal Appellants continue their Mexican Wolf recovery efforts without state permits. As a result, we hold the district court abused its discretion in finding on that basis that the Department had met its burden to show it will suffer irreparable harm absent an injunction.

2. **The Department failed to establish that FWS's anticipated releases pose a significant risk of harm to New Mexico's sovereignty.**

As an alternative basis for affirming the district court's finding of irreparable harm, the Department contends that unpermitted releases of Mexican wolves by FWS will harm the sovereign interests of the State, and that such harm constitutes irreparable injury. The Department did little to raise this argument before the district court in its motion for a preliminary injunction. And not surprisingly, given the parties' focus on the alleged harm to the State's wildlife management efforts, the district court did not address whether FWS's unpermitted releases would irreparably harm the State's sovereignty.

On appeal, in response to Federal Appellant's contention that FWS's contemplated releases do not threaten the State's sovereignty, the Department

---

[23] On appeal, the Department adds a weighty addendum full of extra-record material that it asks this court to consider. But because none of this evidence was presented to the district court, we do not consider it. *See Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016) (limiting review to the evidence before the district court at the time of the preliminary injunction hearing).

34

significantly expands its arguments on this issue. Analogizing the present case to one in which a state has been enjoined from enforcing or effectuating its own statutes, the Department contends the State "faces significant interference with its core government functions to establish and enforce laws within its borders" as a result of FWS's unpermitted releases, and that it "is being pressured to change its laws to bend to the demands of [FWS]." The Department argues these allegations are sufficient to demonstrate a likelihood of irreparable harm because "it is well established that interference with a State's sovereign . . . authority is sufficient to establish irreparable injury." *Id.* at 30–31. We disagree and therefore decline the Department's invitation to affirm based on this alternative claim of irreparable harm.

In rejecting this argument, we need not resolve the threshold issue of whether the State has a valid sovereignty interest in creating and enforcing laws related to the management of wildlife on federal lands. This is because, even assuming the presence of such an interest, the Department has again failed to meet its burden. Specifically, the Department has not presented any factual or legal basis for finding that FWS's anticipated releases would interfere with the State's ability to establish or enforce its laws, or that the releases would pressure the State to change its laws.

It is true, as the Department observes, that "'[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'" *Maryland v. King*, 133 S. Ct. 1, 3 (Roberts, Circuit Justice 2012) (quoting *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (Rehnquist, Circuit Justice 1977)); *see also Planned Parenthood of Greater*

*Texas Surgical Health Servs v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013) ("When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws."). But these holdings contemplate a starkly different situation than the one presented in this case.[24] Here, New Mexico has not been enjoined from establishing, enforcing, or effectuating any of its statutes. Rather, Federal Appellants have been enjoined from effectuating their interpretation of the Act and their internal regulations. In addition, the Department has offered no factual or legal support, other than conclusory allegations, that Federal Appellants' wolf recovery efforts, including releases of wolves without state permits, interfere with the Department's ability to establish or effectuate laws, or pressure the State to change its permitting laws. Instead, Federal Appellants contend that federal law exempts them from such requirements only where the state permitting requirements prevent them from complying with their congressionally-mandated responsibility to recover the species. The Department presents no legal authority that suggests such a limited exemption invades or harms the State's sovereign interests.

Absent a legal or factual basis supporting its contention that the anticipated releases interfere with its core governmental functions, or pressure the State to change its permitting laws, we find the Department's allegations of harm to the

---

[24] Moreover, the Department's reliance on *Texas v. United States*, 787 F.3d 733 (5th Cir. 2015), and *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 697 (10th Cir. 2009), is misplaced, as both cases analyze whether states' sovereignty interests are sufficient to confer standing.

State's sovereignty unavailing and insufficient to provide a proper basis for a finding of irreparable harm.

## B. *The Remaining Preliminary Injunction Factors*

Because the district court abused its discretion in finding the Department had satisfied its burden of showing a significant risk of irreparable injury, we need not address the remaining preliminary injunction factors. *See People for the Ethical Treatment of Prop. Owners v. U.S. Fish and Wildlife Serv.*, --- F.3d ---, 2017 WL 1160873, at *12 (10th Cir. 2017) ("If it is not necessary to decide more, it is necessary not to decide more." (quoting *PDK Labs, Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004))). In the absence of that showing, the State is not entitled to the extraordinary remedy of a preliminary injunction. *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004) (noting "the moving party must first demonstrate that such [irreparable] injury is likely before the other requirements for the issuance of an injunction will be considered"); *see also Vega v. Wiley*, 259 F. App'x 104, 105–06 (10th Cir. 2007) (unpublished) (agreeing with the district court that "a showing of an irreparable injury is a necessary condition for the issuance of a preliminary injunction . . . [and] the absence of this factor required denial"); *Glenwood Bridge, Inc. v. Minneapolis*, 940 F.2d 367, 371 (8th Cir. 1991) ("[I]n any case the threshold inquiry is whether the movant has shown the threat of irreparable injury. Thus, we have held that the movant's failure to sustain its burden of proving irreparable harm ends the inquiry and the denial of the injunctive request is warranted." (internal quotation marks omitted)); *Faulkner v. Jones*, 10 F.3d 226,

37

235 (4th Cir. 1993) ("A failure to establish irreparable harm is by itself a sufficient ground upon which to deny a preliminary injunction." (internal quotation marks omitted)).

## IV.  CONCLUSION

The Department failed to present sufficient evidence to support a finding that it is likely to suffer irreparable harm absent a preliminary injunction. As a result, the district court abused its discretion in granting the Department's request for injunctive relief. We therefore REVERSE and VACATE the district court's order enjoining Federal Appellants from importing and releasing (1) any Mexican gray wolves into the State without first obtaining the requisite state permits, and (2) any Mexican gray wolf offspring into the State in violation of prior state permits, and REMAND to the district court for further proceedings not inconsistent with this Opinion.

**16-2189, 16-2202,** *New Mexico Dept. of Game & Fish v. DOI, et al.*
**MATHESON, J., concurring**

I join the majority opinion with the exception of section III.A.2., which addresses

an issue the district court did not rely on to issue its preliminary injunction and therefore

is one that we need not address.