**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

THE STATE OF COLORADO,

    Plaintiff - Appellee,

v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY; JANE NISHIDA,[*] in her
official capacity as Acting Administrator of
the U.S. Environmental Protection Agency;
U.S. ARMY CORPS OF ENGINEERS;
VANCE F. STEWART, III,[**] in his
official capacity as the Senior Official
Performing the Duties of Assistant
Secretary of the Army for Civil Works,

    Defendants - Appellants,

and

CHANTELL SACKETT; MICHAEL
SACKETT; AMERICAN FARM
BUREAU FEDERATION; AMERICAN
PETROLEUM INSTITUTE; AMERICAN
ROAD AND TRANSPORTATION
BUILDERS ASSOCIATION; CHAMBER
OF COMMERCE OF THE UNITED
STATES OF AMERICA; LEADING
BUILDERS OF AMERICA; NATIONAL

Nos. 20-1238, 20-1262, and 20-1263

_____

[*] Jane Nishida, in her official capacity as Acting Administrator of the U.S. Environmental Protection Agency, is substituted for Andrew Wheeler pursuant to Federal Rule of Appellate Procedure 43(c)(2).

[**] Vance F. Stewart, III, in his official capacity as the Senior Official Performing the Duties of Assistant Secretary of the Army for Civil Works, is substituted for R.D. James pursuant to Federal Rule of Appellate Procedure 43(c)(2).

ALLIANCE OF FOREST OWNERS; NATIONAL ASSOCIATION OF HOME BUILDERS; NATIONAL CATTLEMEN'S BEEF ASSOCIATION; NATIONAL CORN GROWERS ASSOCIATION; NATIONAL MINING ASSOCIATION; NATIONAL PORK PRODUCERS COUNCIL; NATIONAL STONE, SAND, AND GRAVEL ASSOCIATION; PUBLIC LANDS COUNCIL; U.S. POULTRY & EGG ASSOCIATION; AMIGOS BRAVOS; NEW MEXICO ACEQUIA ASSOCIATION; GILA RESOURCES INFORMATION PROJECT,

      Intervenor Defendants - Appellants.

_____

COLORADO WATER CONGRESS; COLORADO FARM BUREAU; COLORADO DAIRY FARMERS; COLORADO PORK PRODUCERS COUNCIL; COLORADO LIVESTOCK ASSOCIATION; COLORADO CATTLEMEN'S ASSOCIATION; COLORADO CORN GROWERS ASSOCIATION; NAVAJO NATION; AMIGOS BRAVOS; NEW MEXICO ACEQUIA ASSOCIATION; GILA RIVER RESOURCES INFORMATION PROJECT; INSTITUTE FOR POLICY INTEGRITY; WESTERN RESOURCE ADVOCATES; CONSERVATION COLORADO,

      Amici Curiae.

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:20-CV-01461-WJM-NRN)**

_____

Jonathan D. Brightbill, Deputy Assistant Attorney General, United States Department of Justice, Environment and Natural Resources Division, Washington, D.C. (Jeffrey Bossert Clark, Assistant Attorney General; Eric Grant, Deputy Assistant Attorney General; and Brian C. Toth and Robert J. Lundman, Attorneys, United States Department of Justice, Environment and Natural Resources Division, Washington, D.C.; and Matthew Z. Leopold, General Counsel; David Fotouhi, Principal Deputy General Counsel, U.S. Environmental Protection Agency; and Craig Schmauder, Deputy General Counsel, Department of the Army; and David R. Cooper, Chief Counsel, U.S. Army Corps of Engineers, with him on the briefs), for Defendants-Appellants.

Glenn E. Roper, Pacific Legal Foundation, Highlands Ranch, Colorado (Anthony L. Francois and Charles T. Yates, Pacific Legal Foundation, Sacramento, California, with him on the briefs), for Intervenor Defendants-Appellants Chantell and Michael Sackett.

Timothy S. Bishop (Brett E. Legner and Colleen M. Campbell, with him on the briefs), Mayer Brown, Washington, D.C., for Intervenor Defendants-Appellants American Farm Bureau Federation; American Petroleum Institute; American Road and Transportation Builders Association; Chamber of Commerce of the United States of America; Leading Builders of America; National Alliance of Forest Owners; National Association of Home Builders; National Cattlemen's Beef Association; National Corn Growers Association; National Mining Association; National Pork Producers Council; National Stone, Sand, and Gravel Association; Public Lands Council; and U.S. Poultry & Egg Association.

Eric Olsen (Philip J. Weiser, Colorado Attorney General; Carrie Noteboom, First Assistant Colorado Attorney General; Annette Quill and Jennifer H. Hunt, Senior Assistant Attorneys General, with him on the briefs), Denver, Colorado, for Plaintiff-Appellee.

Stephen H. Leonhardt, Scott A. Clark, and April D. Hendricks, Burns, Figa & Will, P.C., Greenwood Village, Colorado, filed an amicus brief on behalf of Colorado Water Congress.

Stephen H. Leonhardt, Scott A. Clark, April D. Hendricks, and Kole W. Kelley, Burns, Figa & Will, P.C., Greenwood Village, Colorado, filed an amicus brief on behalf of Colorado Farm Bureau, Colorado Dairy Farmers, Colorado Pork Producers Council, Colorado Livestock Association, Colorado Cattlemen's Association, and Colorado Corn Growers Association.

Jill Elise Grant and Ian Paul Fisher, Jill Grant & Associates, Washington, D.C.; and Doreen N. McPaul, Attorney General, Paul Spruhan, Assistant Attorney General, and

Michelle Brown Yazzie, Navajo Nation Department of Justice, Window Rock, Arizona, filed an amicus brief on behalf of Navajo Nation.

J. Blanding Holman IV, Megan Hinkle Huynh, and Carl Brzorad, Southern Environmental Law Center, Charleston, South Carolina; Charles de Saillan, Douglas Meiklejohn, and Eric Jantz, New Mexico Environmental Law Center, Santa Fe, New Mexico; and Enrique Romero, New Mexico Acequia Association, Santa Fe, New Mexico, filed an amicus brief on behalf of Amigos Bravos, New Mexico Acequia Association, and Gila River Resources Information Project.

Richard L. Revesz, Bethany A. Davis Noll, Max Sarinsky, and Jason A. Schwartz, Institute for Policy Integrity, New York, New York, filed an amicus brief on behalf of Institute for Policy Integrity.

Joro Walker, Western Resource Advocates, Boulder, Colorado, filed an amicus brief on behalf of Western Resource Advocates and Conservation Colorado.

_____

Before **McHUGH**, **BALDOCK**, and **EID**, Circuit Judges.

_____

**BALDOCK**, Circuit Judge.

_____

These are consolidated appeals about what are the "waters of the United States." That statutory phrase—a key component of the Clean Water Act—has been the subject of ongoing debate for nearly five decades. Yet the meaning of the phrase, which the Act does not define, remains elusive and unpredictable. In April 2020, the Environmental Protection Agency and the Army Corps of Engineers once again tried their hands at defining the phrase through a regulation called the Navigable Waters Protection Rule (NWPR).

Colorado swiftly challenged the NWPR in federal court, arguing the new rule, despite its name, does very little to protect waters of the United States and is both substantively and procedurally flawed. Before the NWPR took effect, Colorado

4

asked the district court to enjoin the Agencies from implementing the rule pending a determination on the merits of the case. The district court obliged; it issued an order staying the effective date of the NWPR and preliminarily enjoining the Agencies to continue administering the Clean Water Act under the then-current regulations.

The question before us is straightforward: Did the district court abuse its discretion when it granted Colorado injunctive relief? The answer is yes. Colorado asked for immediate relief but hasn't shown it will suffer irreparable injury absent a preliminary injunction. Because that alone compels us to reverse, we do not consider the other preliminary injunction factors. Exercising jurisdiction under 28 U.S.C. § 1292, we therefore reverse and vacate the district court's order.

## I.

The particulars of this case, like so many others, flow from the "notoriously unclear" reach of the Clean Water Act. *Sackett v. E.P.A.*, 566 U.S. 120, 132 (2012) (Alito, J., concurring). So the reader knows what all the fuss is about, we first review the legislative, administrative, and judicial events relevant to our inquiry. We then recount how these appeals unfolded.

## A.

## 1.

Congress passed the Clean Water Act in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To that end, the Act prohibits "the discharge of any pollutant by any person" without a permit into "navigable waters," which it defines as "waters of the

United States." *Id.* §§ 1311(a), 1362(7), (12). Among the important exceptions to this general prohibition are two permitting schemes that authorize the discharge of pollutants into waters covered by the Act. *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 625 (2018).

The first is the National Pollutant Discharge Elimination System program, colloquially known as the Section 402 permit process, which authorizes the discharge of pollutants other than dredged or fill material. 33 U.S.C. § 1342. The second program authorizes the Corps to issue Section 404 permits for the discharge of dredged or fill material, which "are solids that do not readily wash downstream." *Rapanos v. United States*, 547 U.S. 715, 723 (2006) (plurality opinion); *see also* § 1344 (granting the Secretary of the Army, acting through the Corps, authority to issue permits). Both programs let states operate their own permitting schemes for waters within their respective borders. §§ 1342(b), 1344(g). Although many states operate their own Section 402 program, only two have opted to assume Section 404 permitting authority for dredged and fill material.

Obtaining a permit through these programs is a costly and lengthy process, *U.S. Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807, 1812 (2016), but failing to comply can come at an even steeper price. The Clean Water Act imposes significant criminal and civil penalties for polluting waters covered by the Act without a permit. §§ 1319(c), (d). Despite these important consequences, Congress did not define what it meant by "waters of the United States." Rather than provide a

6

reasonably clear rule regarding the scope of the Clean Water Act, Congress delegated that duty to the EPA and the Corps.

2.

Unsurprisingly, the Agencies have struggled for more than forty years with the "contentious and difficult task" of defining "waters of the United States." *Nat'l Ass'n of Mfrs.*, 138 S. Ct. at 624. The Supreme Court has, in turn, examined their efforts on several occasions. First, in *United States v. Riverside Bayview Homes*, 474 U.S. 121 (1985), the Court deferred to a regulation that extended the Corps' jurisdiction under § 1344 to wetlands "adjacent to navigable or interstate waters and their tributaries." *Id.* at 129, 135. In doing so, the Court signaled that the term "waters of the United States" includes something more than traditional navigable-in-fact waters. *Id.* at 133.

Several years later, in *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159 (2001), the Court rejected the Corps' assertion of regulatory jurisdiction over an abandoned sand and gravel pit that "seasonally ponded" but was not adjacent to open water. *Id.* at 162, 164. The Court held that the Clean Water Act could not be interpreted to cover "nonnavigable, isolated, intrastate waters" because the term "navigable" must be given meaning within the context and application of the statute. *Id.* at 172; *see also id.* at 168 ("In order to rule for [the Corps] here, we would have to hold that the jurisdiction of the Corps extends to ponds that are *not* adjacent to open water. But . . . the text of the statute will not allow this.").

7

The Court most recently considered the breadth of the Corps' jurisdiction over wetlands in *Rapanos v. United States*, 547 U.S. 715 (2006). In two consolidated appeals from decisions upholding jurisdictional determinations, the Court attempted to shed light on when wetlands not adjacent to navigable-in-fact waters are waters of the United States. Five Justices concluded remand was necessary for consideration of whether the Corps had overextended its regulatory jurisdiction under the Clean Water Act. *Id.* at 757 (plurality opinion); *id.* at 786–87 (Kennedy, J., concurring). But unfortunately, *Rapanos* produced no majority opinion "on precisely how to read Congress' limits on the reach of the Clean Water Act" and left interested parties "to feel their way on a case-by-case basis." *Id.* at 758 (Roberts, C.J., concurring).

The *Rapanos* plurality suggested wetlands fall within the scope of the Act only when they (1) are adjacent to a "relatively permanent body of water connected to traditional interstate navigable waters" and (2) have "a continuous surface connection with that water." *Id.* at 742 (plurality opinion). Justice Kennedy, concurring in the judgment to reverse, found the plurality's test too limiting. *Id.* at 776–78 (Kennedy, J., concurring in the judgment). Instead, he articulated an alternative formulation, under which "the Corps' jurisdiction over [adjacent] wetlands depends upon the existence of a significant nexus between the wetlands in question and navigable waters in the traditional sense." *Id.* at 779. The requisite nexus exists, Justice Kennedy explained, "if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Id.* at 780.

8

The dissent found both of these tests too restrictive; it would have deferred to what it viewed as the Corps' reasonable interpretation of "waters of the United States" and upheld the agency's jurisdictional determinations. *Id.* at 796 (Stevens, J., dissenting).

After *Rapanos*, the EPA and the Corps issued internal guidance explaining they would apply their regulations consistent with Justice Kennedy's significant-nexus test. And in 2015, the Agencies formally incorporated the significant-nexus standard as the legal touchtone for the new regulatory definition of waters of the United States. Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg. 37,054, 37,060 (June 29, 2015). The Agencies' attempt to redefine the key statutory phrase resulted in a new administration's prompt overhaul and myriad legal challenges. *See Nat'l Ass'n of Mfrs.*, 138 S. Ct. at 625–27; Executive Order 13778: Restoring the Rule of Law, Federalism, and Economic Growth by Reviewing the "Waters of the United States" Rule, 82 Fed. Reg. 12,497 (Feb. 28, 2017); Definition of "Waters of the United States"—Addition of an Applicability Date to 2015 Clean Water Rule, 83 Fed. Reg. 5,200 (Feb. 6, 2018); Definition of "Waters of the United States"—Recodification of Pre-Existing Rules, 84 Fed. Reg. 56,626 (Oct. 22, 2019).

On April 21, 2020, the Agencies published a final rule revising the definition of waters of the United States: The Navigable Waters Protection Rule. 85 Fed. Reg. 22,250. The NWPR defines "waters of the United States" as: (1) "The territorial seas" and traditional navigable waters; (2) "Tributaries" of those waters; (3) "Lakes and ponds, and impoundments of jurisdictional waters; and (4) Adjacent wetlands." 33 C.F.R. § 328.3(a) (2020). Adhering more closely to the plurality opinion in

9

*Rapanos*, the NWPR "presents a unifying legal theory for federal jurisdiction over those waters and wetlands that maintain a sufficient surface water connection to traditional navigable waters or the territorial seas." 85 Fed. Reg. at 22,252. The NWPR's primary means to that end are several definitions that narrow the scope of what constitutes waters of the United States.[1] Although it's unclear precisely how many miles of waterways and acres of wetlands the NWPR puts outside the reach of the Clean Water Act, the rule undisputedly represents a significant reduction in the scope of jurisdiction the Agencies have asserted in the past.

3.

Having outlined the federal statutory and regulatory background, we turn now to explaining how that complex administrative scheme interplays with Colorado law on polluting state waters. Colorado's "state waters" are defined more broadly than waters of the United States. Its state waters are "any and all surface and subsurface waters which are contained in or flow in or through" Colorado, with minor exceptions not relevant here. Colo. Rev. Stat. § 25-8-103(19). Colorado law

---

[1] Under the NWPR, "adjacent wetlands" include those that "[a]but" or are "inundated by flooding from" another jurisdictional water "in a typical year," as well as wetlands separated from a jurisdictional water "only by a natural berm, bank, dune, or similar natural feature." 33 C.F.R. § 328.3(c)(1). Wetlands are not adjacent, and thus fall outside the definition of waters of the United States, if they are physically separated from a jurisdictional water by an artificial structure and lack a direct hydrologic surface connection to such water. *Id.* The NWPR includes tributaries that contribute perennial or intermittent surface water flow to a traditional navigable water during a "typical year." *Id.* § 328.3(c)(12). Ephemeral features, including "ephemeral streams, swales, gullies, rills, and pools" are categorically not waters of the United States. *Id.* § 328.3(b)(3). But discharges of pollutants to those nonjurisdictional waters remain regulated under the Clean Water Act if the discharges are conveyed to downstream navigable waters. 85 Fed. Reg. at 22,297.

prohibits discharges of pollutants into state waters without a permit. *Id.* § 25-8-501(1) ("No person shall discharge any pollutant into any state water from a point source without first having obtained a permit from the division."); *see also id.* § 25-8-103(15) ("'Pollutant' means dredged spoil, dirt, slurry, solid waste, incinerator residue, sewage, sewage sludge, garbage, trash, chemical waste, biological nutrient, biological material, radioactive material, heat, wrecked or discarded equipment, rock, sand, or any industrial, municipal, or agricultural waste.").

Colorado administers a Section 402 permitting program, as delegated by the EPA, and grants permits to discharge pollutants regulated under 33 U.S.C. § 1342. But Colorado, like many other states, has not opted to assume Section 404 authority and operate its own permitting program for dredging and filling waters within the State. Instead, Colorado relies on the Corps' Section 404 permits to authorize dredge and fill activities that impact waters of the United States. Under Colorado law, "each permit issued pursuant to the federal act [i.e., the Clean Water Act] shall be deemed to be a temporary permit issued under this article which shall expire upon expiration of the federal permit." Colo. Rev. Stat. § 25-8-501(1).

## B.

These consolidated appeals unfolded against that backdrop. After publication of the NWPR, Colorado filed a lawsuit challenging the rule. Its complaint alleged the Agencies violated the Administrative Procedure Act (APA) because the NWPR (1) is not in accordance with law, (2) is arbitrary and capricious, and (3) suffers from procedural flaws. According to Colorado, the Corps also violated the National

11

Environmental Protection Act because it promulgated the NWPR without preparing an Environmental Impact Statement.

Colorado subsequently filed an amended motion for a preliminary injunction requesting the district court enjoin the Agencies from implementing the NWPR in the State. Without holding a hearing, the district court determined Colorado was entitled to injunctive relief. On June 19, 2020, three days before the NWPR was scheduled to take effect, the district court stayed the effective date of the rule and enjoined the Agencies to continue administering Section 404 of the Clean Water Act in Colorado under the then-current regulations.

The Agencies timely appealed. Additionally, a coalition of fourteen national trade associations (Business Appellants) filed their own notice of appeal on July 15, 2020, which was the day the district court granted their motion to intervene. Chantell and Michael Sackett, another pair of intervenor-defendants, filed their notice of appeal the next day.

II.

We review the district court's decision to grant preliminary injunctive relief for abuse of discretion. *New Mexico Dep't of Game & Fish v. United States Dep't of the Interior*, 854 F.3d 1236, 1245 (10th Cir. 2017). In doing so, "we review the district court's factual findings for clear error and its conclusions of law de novo." *Id.* (quoting *Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016)). "An abuse of discretion occurs where a decision is premised on an erroneous conclusion of law or where there is no rational basis in the evidence for the ruling." *Id.*

12

Because a preliminary injunction is an "extraordinary remedy never awarded as of right," *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008), the movant must make a "clear and unequivocal" showing it is entitled to such relief, *Port City Props. v. Union Pac. R.R. Co.*, 518 F.3d 1186, 1190 (10th Cir. 2008) (quoting *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004)). To obtain a preliminary injunction, the movant must show (1) it "is substantially likely to succeed on the merits," (2) it "will suffer irreparable injury if the injunction is denied," (3) its "threatened injury outweighs the injury the opposing party will suffer under the injunction," and (4) "the injunction would not be adverse to the public interest." *New Mexico Dep't of Game & Fish*, 854 F.3d at 1246 (quoting *Fish*, 840 F.3d at 723). These four factors also determine when a court should grant a stay of agency action under section 705 of the APA. *See Associated Sec. Corp. v. SEC*, 283 F.2d 773, 774–75 (10th Cir. 1960) (applying the four traditional preliminary injunction factors under 5 U.S.C. § 705's predecessor statute); *cf. Winkler v. Andrus*, 614 F.2d 707, 709 (10th Cir. 1980) (explaining that a § 705 stay is a provisional remedy in the nature of a preliminary injunction); *see also Cook Cty., Illinois v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020) (stating that the preliminary-injunction standard governs applications for stays under 5 U.S.C. § 705).

Certain types of preliminary injunctions are disfavored and require a movant to satisfy a heightened standard. *New Mexico Dep't of Game & Fish*, 854 F.3d at 1246 n.15. "They are '(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the

13

relief that it could recover at the conclusion of a full trial on the merits.'" *Id.* (quoting *Fish*, 840 F.3d at 723–24). When seeking a disfavored injunction, the movant "must make a strong showing" both on the likelihood of success on the merits and on the balance of the harms. *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 976 (10th Cir. 2004) (en banc).

On appeal, the Appellants collectively challenge the district court's determinations on all four preliminary injunction factors. They first contend the district court erred in concluding Colorado would likely succeed on the merits by misconstruing the Supreme Court's fractured decision in *Rapanos* to foreclose the approach taken in the NWPR. Second, for reasons described below, the Agencies argue the district court abused its discretion when it found Colorado made a sufficient showing of irreparable injury. Finally, the Agencies and Business Appellants claim the district court erred in balancing the equities and public interest—the two remaining preliminary injunction factors—by ignoring the harm the stay imposes on the regulated community and discounting the jurisdictional clarity the NWPR provides.

As a threshold matter, we need not determine whether the district court issued a mandatory preliminary injunction requiring heightened scrutiny. Under either the normal or heightened standard for preliminary injunctions, Colorado was required to—but did not—show it will suffer irreparable injury if an injunction is denied. In other words, even if the normal standard (i.e., the easier burden) for preliminary injunctions applies, Colorado has failed to meet that standard.

14

III.

With the legal standards laid out, we can turn to the question before us: Did the district court abuse its discretion by granting Colorado preliminary injunctive relief? In answering that question, we begin our review with irreparable injury—the "single most important prerequisite for the issuance of a preliminary injunction," which must be met "before the other requirements for the issuance of an injunction will be considered." *New Mexico Dep't of Game & Fish*, 854 F.3d at 1249 (quoting *Dominion Video Satellite, Inc.*, 356 F.3d at 1260). And because the district court abused its discretion when it found Colorado made a sufficient showing of irreparable harm, we likewise end our review with this dispositive factor.

A.

To merit preliminary injunctive relief, a movant must present a "significant risk" it "will experience harm that cannot be compensated after the fact by money damages." *Id.* at 1250 (quoting *Fish*, 840 F.3d at 751–52). That harm "must be both certain and great," not "merely serious or substantial." *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001). And a speculative or theoretical injury will not suffice. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009). The injury must also be "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Schrier v. Univ. of Co.*, 427 F.3d 1253, 1267 (10th Cir. 2005) (quoting *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003)). If the harm is not "likely to occur before the district court rules on the merits," there is no need for preliminary injunctive relief.

15

*New Mexico Dep't of Game & Fish*, 854 F.3d at 1250 (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1260 (10th Cir. 2003)).

Before the district court, Colorado proffered several reasons why it would be irreparably harmed by the NWPR's narrowing of federal jurisdiction. Colorado claimed the NWPR would create a "permitting gap" where projects involving the dredging or filling of state waters must halt because it relies exclusively on federal permits to authorize those activities in compliance with state law. At the same time, Colorado asserted the removal of federal protections would cause significant environmental harm to its waters because developers would disregard state law and illegally move forward with unregulated dredge and fill projects.

The district court determined neither of those harms justified the extraordinary remedy of preliminary injunctive relief. But it found Colorado established irreparable injury by showing the NWPR would force it to undertake enforcement action in place of the federal government to protect the quality of its waterbodies. Starting with the ground the district court credited, we examine each of Colorado's alleged injuries and conclude it has failed to establish a significant risk of irreparable harm absent preliminary injunctive relief.

1.

According to the Agencies, there are two independently sufficient reasons why the district court erred when it found irreparable harm. First, they argue the district court violated the principle of party presentation because Colorado did not assert irreparable harm stemming from an increased enforcement burden. Second, the

16

Agencies contend the district court abused its discretion because the record does not establish that the alleged enforcement burden is certain, great, actual, or imminent. Although the Agencies' first argument fails, we agree with their second one.

a.

The principle of party presentation is a fundamental premise of our adversarial system. *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020). That means "we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Id.* (quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008)). In other words, "courts do not sit as self-directed boards of legal inquiry and research." *Nat'l Aeronautics & Space Admin. v. Nelson*, 562 U.S. 134, 147 n.10 (2011) (quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) (Scalia, J.)). Instead, they "wait for cases to come to them, and when cases arise, courts normally decide only questions presented by the parties." *Sineneng-Smith*, 140 S. Ct. at 1579 (brackets omitted) (quoting *United States v. Samuels*, 808 F.2d 1298, 1301 (8th Cir. 1987) (Arnold, J., concurring in denial of reh'g en banc)).

Although Colorado did little to raise its enforcement-burden argument in its motion for a preliminary injunction, the district court did not cut this theory of harm out of whole cloth. Before the district court, Colorado alleged the NWPR "imposes an immediate compliance and enforcement burden on [the State], which does not currently have dedicated funding or staffing resources to undertake enforcement against illegal fill activities and instead has relied on EPA and Corps oversight."

17

Colorado also argued that "[e]nforcing against illegal fill activity in state waters will require the State to divert resources currently dedicated to other water pollution activities, threatening compliance and enforcement across clean water programs."

For these reasons, the district court did not fall prey to the same temptations the Supreme Court sternly warned against in *Sineneng-Smith*, the primary case on which the Agencies rely. In *Sineneng-Smith*, the Ninth Circuit identified new arguments on appeal, invited supplemental briefing on those arguments from amici, and restructured the oral argument and ultimate decision based on those arguments. 140 S. Ct. at 1580–81. In doing so, the Court unanimously held, the Ninth Circuit "departed so drastically from the principle of party presentation as to constitute an abuse of discretion." *Id.* at 1578.

As described above, the circumstances here are substantially different from those in *Sineneng-Smith*. The district court did not "takeover" the motion for a preliminary injunction or conjure up a theory of irreparable harm contrary to those Colorado presented. *See id.* at 1581. Colorado's briefing on the enforcement burden may have been inartful, but it did allege such harm would occur because of the NWPR. As such, the district court did not exceed the bounds of its discretion in finding the argument adequately presented.

b.

That conclusion does not end our inquiry, however, because allegations are not enough to warrant preliminary injunctive relief. The party seeking that extraordinary remedy faces a high bar—it must make a clear and unequivocal showing it will likely

18

suffer irreparable harm absent preliminary relief. *New Mexico Dep't of Game & Fish*, 854 F.3d at 1250–51. A review of the record evidence shows the district court abused its discretion when it found Colorado met this burden.

The only specific evidence Colorado presented to support its claim of harm associated with the increased enforcement burden it would bear under the NWPR is the declaration of Nicole Rowan, the Clean Water Program Manager for the State's Water Quality Control Division. In her declaration, Ms. Rowan asserted that "Colorado will need to and will take enforcement action against illegal fill activity in state waters" because of the NWPR's reduction in Clean Water Act jurisdiction. And because the Water Quality Control Division lacks dedicated funding to undertake this enforcement effort, Ms. Rowan explained, Colorado will have to divert resources from other clean water programs to the detriment of those programs. Ms. Rowan also noted that the EPA "has historically completed between three and five enforcement cases in Colorado per year for 404 permit violations."

Based on that evidence, the district court found "violations of Section 404 [i.e., dredge and fill violations] consistently happen, requiring enforcement action," and "[a]t least some of that enforcement burden . . . will now fall in Colorado's lap." But to constitute irreparable harm, an injury must be imminent, certain, actual and not speculative. *New Mexico Dep't of Game & Fish*, 854 F.3d at 1251. When viewed through that lens, Ms. Rowan's declaration has notable omissions.

First, imminence. Although Ms. Rowan's declaration includes a conclusory statement that the NWPR will "create an immediate compliance and enforcement

19

burden," it fails to specify when Colorado would need to take enforcement action in place of the federal government. The declaration only provides that this obligation "*could* begin as soon as the [NWPR] goes into effect" and that "Colorado will need to assume some of this [enforcement] burden *in the future*." These vague assertions are insufficient to support a finding, which the district court did not explicitly make, that Colorado would likely suffer an increased enforcement burden before a decision on the merits. And if the harm is not likely to occur before the district court rules on the merits, there is no need for preliminary injunctive relief. *New Mexico Dep't of Game & Fish*, 854 F.3d at 1250.

Second, actuality and certainty. Ms. Rowan's declaration indicates the EPA has historically undertaken three to five enforcement actions in Colorado per year because of dredge or fill violations. That's it. The declaration doesn't describe when these unidentified enforcement actions occurred, what they entailed, or where the violations occurred. Nor does it say those past enforcement actions involved waters covered under the prior regulation but not under the NWPR, which the district court dubbed "disputed waters." In other words, Ms. Rowan's declaration fails to tie any alleged reduction in federal enforcement—and thus any potential increase in Colorado's enforcement burden—to the jurisdictional changes under the NWPR.

No other evidence before the district court fills in these gaps. Instead, the district court merely assumed that "[a]t least some" of the past EPA enforcement actions referenced in Ms. Rowan's declaration involved the dredging or filling of disputed waters. Going one step further, the court determined Colorado would need

20

to pursue a similar number of enforcement actions in place of the federal government to protect the quality of its waterways. By this point, the district court's conclusion had crossed over from reasonable inference to pure speculation.

At bottom, the evidence Colorado presented is insufficient to support the district court's finding of irreparable harm. The record evidence raises, at most, the mere possibility of the potential for a small increase in Colorado's enforcement burden at some point in the future. That is insufficient because "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. Neither Ms. Rowan's declaration nor any other affidavit before the district court provides evidence that the NWPR would likely cause a reduction in federal enforcement and, consequently, an increase in Colorado's enforcement burden before a decision on the merits.

For these reasons, the record did not provide a sufficient basis for finding Colorado would suffer certain, actual, and imminent harm stemming from the alleged enforcement burden it would bear in place of the federal government under the NWPR. The district court therefore abused its discretion when it found irreparable harm on that basis.

2.

As an alternative ground for upholding the district court's order, Colorado attempts to resuscitate its permitting-gap argument. According to Colorado,

21

discharges of dredged or fill material into its waters are flatly prohibited under state law in the absence of federal Section 404 permits. Because it has no legal mechanism to authorize the filling of disputed waters, Colorado maintains, the NWPR's narrowing of waterbodies subject to Clean Water Act jurisdiction will result in the delay or cancellation of development and infrastructure projects. As a result, Colorado argues the permitting gap will cause it to suffer irreparable economic harm because it must either spend unrecoverable funds setting up its own Section 404 permitting program or forgo certain development projects.

Colorado has failed to show the district court erred when it rejected this claim of irreparable harm. For starters, the injury is not legally cognizable because the economic harm stemming from Colorado's inability to authorize the discharge of dredged or fill material into disputed waters is not fairly traceable to the Agencies' alleged unlawful conduct. It is self-inflicted, resulting from Colorado's legislative decision to effectively prohibit dredge and fill activities in state waters not covered by the Clean Water Act. *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam) ("The injuries to the plaintiffs' fiscs were self-inflicted, resulting from decisions by their respective state legislatures. . . . No State can be heard to complain about damage inflicted by its own hand."); *Petro–Chem Processing, Inc. v. EPA*, 866 F.2d 433, 438 (D.C. Cir. 1989) (Ginsburg, R.B., J.) (explaining that self-inflicted

22

injuries cannot satisfy the requirements for Article III standing because they break the causal chain linking the defendant's conduct to the asserted injury).[2]

But even if Colorado's permitting gap was a cognizable (as opposed to self-inflicted) injury, it would still fall short of warranting preliminary injunctive relief. The district court found Colorado failed to present any evidence of imminent harm stemming from its inability to authorize the discharge of dredged or fill materials into disputed waters. On appeal, Colorado has likewise not pointed to any particular evidence of a dredge or fill operation that is ready to start but will need a federal permit to move forward before the case is decided on the merits.

Colorado also concedes it will not incur costs by creating and administering a permitting program for the discharge of dredged or fill material anytime soon because legislative action is needed to provide this new regulatory authority. The Colorado Water Quality Control Division supported legislation to address the permitting gap, but the measure failed during the most recent legislative session.

---

[2] We recognize *Pennsylvania v. New Jersey* involved a dispute between two states and the invocation of the Supreme Court's original jurisdiction. 426 U.S. at 662–63. But the self-inflicted injury doctrine is not limited to the original jurisdiction context. *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (applying *Pennsylvania* outside the original jurisdiction context); *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 n.8 (10th Cir. 2005) (quoting *Pennsylvania* when recognizing the self-inflicted doctrine may apply); *Zimmerman v. City of Austin*, 881 F.3d 378, 389 (5th Cir. 2018) ("[S]tanding cannot be conferred by a self-inflicted injury."); *Parvati Corp. v. City of Oak Forest*, 630 F.3d 512, 517–18 (7th Cir. 2010) (concluding the plaintiff lacked standing because the asserted injury was self-inflicted). In any event, Colorado does not mention *Pennsylvania* in its brief—let alone argue its holding is inapplicable here.

Thus, the district court did not abuse its discretion when it found Colorado failed to show the permitting gap would likely cause it to suffer imminent, irreparable harm.

3.

We turn next to Colorado's other alternative theory of irreparable injury. Colorado argues the NWPR's narrowing of federal jurisdiction, which will allegedly leave half of its state waters unprotected, would cause it to suffer significant environmental harm. Specifically, Colorado contends the loss of federal oversight and Section 404 permitting requirements is likely to result in illegal dredging or filling of disputed waters, which in turn would harm its wetlands, wildlife, and water resources. Although the district court recognized Colorado has an interest in protecting its waters, it found that "Colorado's alleged chain of causation between the [NWPR] and the damage to state waters is pure speculation." We agree.

"Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987); *see also Catron Cty. Bd. of Comm'rs v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1440 (10th Cir. 1996). But the problem with Colorado's argument isn't the type of harm alleged. It's causation.

The principle of causation for Article III standing requires a plaintiff's injury to be "fairly traceable to the challenged *action of the defendant*, and not the result of the independent action of some third party not before the court." *Bronson v. Swensen*, 500 F.3d 1099, 1109 (10th Cir. 2007) (quoting *Nova Health Sys.*, 416 F.3d

24

at 1156).  When "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*," standing "is not precluded, but it is ordinarily substantially more difficult to establish."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992) (quotation marks and citations omitted).  In that circumstance, the plaintiff bears the burden of "adducing facts showing that those third-party choices have been or will be made in such manner as to produce causation and permit redressability of injury."  *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 478 (D.C. Cir. 2009) (brackets omitted) (quoting *Lujan*, 504 U.S. at 562).

Here, Colorado relies on too tenuous a causal link between its allegations of environmental harm and the jurisdictional changes made by the NWPR.  Colorado alleges significant environmental harm would likely occur if federal protections are withdrawn from disputed waters because developers will likely disregard state law and illegally fill those waters.  Yet, as the district court found, Colorado has not adduced specific facts suggesting a "previously-permitted developer (one who has so far sought to obey the law)" would likely "conclude that the narrowing of one law means there must be no more laws to comply with."  Colorado has only presented evidence that illegal fill has happened in the State under the pre-NWPR regulatory framework—not that the NWPR would make illegal fill more likely.

Colorado's alleged causal chain fails to adequately establish causation because it relies on speculation that independent developers not present in this case will illegally dredge or fill disputed waters.  *See R.J. Reynolds Tobacco Co. v. U.S. Food*

25

*& Drug Admin.*, 810 F.3d 827, 831 (D.C. Cir. 2016) (rejecting "assertions of imminent injury where the prospective injury depends on future illegal activity" by third parties); *see also Lujan*, 504 U.S. at 562 (explaining the reluctance to find standing when the claimed injury "depends on the unfettered choices made by independent actors not before the courts." (quoting *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989) (opinion of Kennedy, J.))). Although some entities may believe Colorado lacks authority under state law to enforce against unpermitted dredging and filling, considerable reason exists to believe developers will not test the strength of this argument by risking an enforcement action against them. As Colorado has made clear, it "must"—and it will—"seek to enforce its current statutory scheme," which, in its view, "does not allow for dredge and fill activities in state waters that are no longer covered by the federal Act."

On this record, it is pure speculation whether the NWPR's reduction in federal jurisdiction would result in an increase, rather than a decrease or no change, in the number of dredge and fill violations committed in Colorado. When predictions are so uncertain, an injury is not cognizable—let alone sufficient to warrant the extraordinary remedy of preliminary injunctive relief. Because Colorado has failed to show the NWPR poses an actual and imminent risk of environmental harm within the State, we decline its invitation to affirm the district court's order based on this alternative claim of irreparable injury.

26

B.

When the failure to satisfy one factor is dispositive, a court need not consider the other factors. *New Mexico Dep't of Game & Fish*, 854 F.3d at 1255. As discussed above, the lack of irreparable injury is dispositive; a movant must show a significant risk of irreparable injury to get preliminary injunctive relief. *Id.* Because the district court abused its discretion when it found Colorado made that showing, we need not address the remaining preliminary injunction factors. *See id.*

IV.

In sum, the district court abused its discretion when it granted Colorado's request for preliminary injunctive relief. So we REVERSE and VACATE the district court's order staying the effective date of the NWPR and enjoining the Agencies to continue administering Section 404 of the Clean Water Act in Colorado under the pre-NWPR regime. We also REMAND to the district court for further proceedings consistent with this opinion.